# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

**In re**:

      **Joe Thomas Turner and**
      **Ru Than Turner, d/b/a San Man,**

          **Debtors.**                    **No. 7-03-10672 ML**

**First Savings Bank,**
      **Plaintiff,**

**v.**                                        **Adv. No. 05-1072 M**

**Joe Thomas Turner and**
**Ru Than Turner,**
      **Defendants.**

**United States Trustee,**
      **Plaintiff,**

                                **Adv. No. 05-1090 M**
                                **joined with**
**v.**                                        **Adv. No. 05-1072 M**

**Joe Thomas Turner and**
**Ru Than Turner,**
      **Defendants.**

## MEMORANDUM OPINION

THIS MATTER comes before the Court on the Plaintiff United States Trustee's Motion for Summary Judgment (the "Motion") filed on December 22, 2006 (Doc. 72) and on Plaintiff Creditor First Savings Bank's Motion for Summary Judgment (the "Bank's Motion") filed on December 28, 2006 (Doc. 73), (collectively, the "Motions").[1] Defendants Joe Thomas Turner

---

[1] Plaintiff First Savings Bank states in its Motion that it adopts and incorporates by reference the U.S. Trustee's Motion for Summary Judgment and files its Motion as a supplement to the Trustee's Motion, with additional proposed undisputed facts and two additional issues of law.

1

and Ru Than Turner ("Defendants") filed a Response to the Bank's Motion for Summary Judgment on January 30, 2007 ("Response to Bank's Motion") and a Response to the Trustee's Motion for Summary Judgment on January 31, 2007 ("Response to Trustee's Motion).

The Trustee's Complaint requests denial of discharge under the following Bankruptcy Code sections: 1) 11 U.S.C. § 727 (a)(2)[2] for transfer or concealment of assets within one year of bankruptcy or after the bankruptcy filed; 2) § 727 (a)(3) for failure to maintain records from which the debtor's financial condition or business transactions might be ascertained; 3) § 727 (a)(4) for a making false oath or account; and 4) § 727 (a)(5) for failure to satisfactorily explain the loss of assets. Both Motions request denial of discharge under these sections.

After reviewing the Motions, the affidavits, depositions and exhibits to the Motions, the arguments and authorities, the Court has determined that summary judgment denying discharge is appropriate under §§ 727 (a)(2), (a)(4) and (a)(5), and in connection therewith finds the following:

Undisputed Facts

1. Defendants filed a Chapter 11 bankruptcy on January 29, 2003, which was converted to a Chapter 7 bankruptcy on January 10, 2005.

2. Defendants engaged in farming, ranching, construction and the operation of a gravel pit. Tr's Ex. 1 (Transcript of Creditors Meeting on March 26, 2003 at p. 3). Defendants did construction work and operated a gravel pit under the trade name San Man Construction ("San Man"). Tr's Ex. 1

---

[2] All future statutory references are to title 11 of the United States Code unless otherwise specified.

3.  Defendants have three sons, Jason, Justin and Tracy Turner.  Jason and Justin Turner do business as Turner Brothers Construction, Inc., a corporation that was formed on February 28, 2005. Tr's Ex. 15.  Justin Turner is the President and Jason Turner is the Vice President of Turner Brothers Construction, Inc.  Bank's Ex. 14, Jason Turner Dep. (2/2806) p. 9.

4.  On March 14, 2003, Defendants filed Schedules and Statements in the Chapter 11 bankruptcy signed under penalty of perjury ("Original Schedules"). Tr's Ex. 2.

5.  The Bank and the Unsecured Creditors Committee (the "UCC") filed Motions to dismiss or convert and to appoint a Chapter 11 trustee.[3]  Both of these motions and several objections to the Defendants' First Amended Disclosure Statement were resolved at a settlement conference before Magistrate Judge Alan C. Torgerson in February 2004.  On March 17, 2004, the Bank, the UCC, Defendants and the objecting creditors filed a Stipulation Dismissing UCC's Alternative Motion to Dismiss or Convert Case To Chapter 7, First Savings Bank's Motion for Appointment of Trustee or Examiner and Withdrawal of Objections to Debtors' First Amended Disclosure Statement (the "March 2004 Stipulation") (Doc. 374; No. 03-10672). *See* Tr's Mtn Ex. 3.  The Court entered an Order Approving Stipulation on May 5, 2004 (Doc. 435; No. 03-10672).

6. Pursuant to the March 2004 Stipulation, the Debtors were required, *inter alia,* to do the following:  1) make **complete disclosures of their assets and liabilities**; 2) **amend their statements and schedules** as needed with additional disclosures; 3) make no more payments to

---

[3]  *See* Bank's Motion for Appointment of Trustee or Examiner on April 21, 2003 (Doc. 67; No. 03-10672) and UCC's Alternative Motion to Dismiss or Convert Case to Chapter 7 filed on November 20, 2003 (Doc. 224; No. 03-10672).  The Bank filed a Joinder to the UCC's Motion to Dismiss or Convert (Doc. 252).

or trades with pre-petition creditors, or **transfers to insiders** unless done through a confirmed plan or with Court approval; and 4) **fully disclose in advance all transactions or sales of assets out of the ordinary course of business worth more than $1,000.00**, including trades, pledges and work done in exchange for debt relief.[4] Tr's Ex. 3 (emphasis added).

7.  The March 2004 Stipulation required conversion of the bankruptcy to Chapter 7 if Defendants failed to meet the requirements. Tr's Ex. 3.

8.  On April 12, 2004, Defendants filed Amendments to Schedules A, D and G and an Amendment to Statement of Financial Affairs (Docs. 402 and 405). Tr's Exs. 4 and 6.  In Amended Schedule A Defendants reported ownership of 83.1 acres of land near the aggregate pit valued at $124,650.00, with a secured claim in the amount of about $114,000.00, which was reported on the Original Schedules as 80 acres with the same value and with a secured claim of $124,650.00. Tr's Exs. 2 and 4. These were the only changes to Defendants' disclosure of property in Schedule A.

9.  While in Chapter 11, Defendants filed monthly operating reports ("MOR's"), which Defendants swore under penalty of perjury were true and accurate. *See, e.g.,* Docs. 59, 258, 512, and 576; No. 03-10672.

**The Conversion to Chapter 7**

---

[4] The Stipulation also required Defendants 1) to provide to the UCC and the Bank financial disclosures in the form of bank statements and financial statements along with monthly operating reports by the 20th day of each succeeding month; 2) to make monthly payments of $5,000.00 into the Court registry to be used upon Court approval for payment of administrative expenses; 3) to disclose all contact with interested purchasers of any of the Defendant' real property within forty-eight hours of contact; 4) to obtain an assignment from Defendants' son Jason Turner of his interest in the Moody Ranch Lease within thirty days of the Stipulation; 5) to forward all proceeds from the sale of cattle to the Bank for escrow by the Bank; and 6) to sell all real estate and leasehold interests within one year of the Stipulation. *See* Tr's Ex. 3.

4

10.  On October 13, 2004, four months after the March 2004 Stipulation, the Bank filed a

Notice of Uncured Default and Conversion to Chapter 7 Pursuant to Stipulation (Doc. 566; No.

03-10672).  After an evidentiary hearing, the Court entered the Order Granting Motion to

Enforce Stipulation and Converting Case to Chapter 7 on January 10, 2005 ("Conversion

Order") (Doc. 661; No. 03-10672). Tr's Ex. 5.

11.  In the Conversion Order the Court made the following findings of fact:[5]

a. In February 2003, just after the bankruptcy filing, Gerald Billings ("Billings") loaned
$50,000.00 to the Debtors.  In mid-May 2004 just after the Stipulation was filed,
approximately 63 head of cattle located on the Cow Springs Ranch were transferred to
Billings by Justin Turner, Defendants' son.  The cattle were assets of Debtors'
bankruptcy estate with a value of approximately $25,000.00 to $30,000.00.  Mr. Turner
testified that he was not aware of the transfer of cattle by his son.  Tr's Mtn Ex. 5.
Neither the loan nor the transfer of cattle were disclosed as required by the Stipulation.
Tr's Ex. 5 ¶¶ 6-8.[6]

b. Debtors have incurred post-petition taxes that remain unpaid.  The July 2004 MOR
contains a statement that there are no post-petition payroll taxes or other taxes past due.
Tr's Ex. 5 ¶ 12.

c. Debtors have made minimal efforts to identify assets of their bankruptcy estate. The
MOR for August 2004 contains a substantial list of equipment belonging to the
bankruptcy estate that Debtors reported as either sold by Tracy Turner or missing.  The
Court found that there was no evidence that Debtors had taken any action to determine
the location of the missing equipment or to recover the proceeds of equipment that was
sold. Conversion Order Tr's Ex. 5 ¶ 15.

**The Ru Than Turner Investment Account**

12.  On January 7, 1997 a joint mutual fund account was opened in the names of Ru Than

Turner's parents, S.B. Schrampfer and Lucille Schrampfer. Tr's Ex. 61 p. 1 (Daily Account

---

[5] In the Conversion Order, the Court refers to Defendants as Debtors.

[6] Although not specifically found in the Conversion Order, the post-petition loan from
Billings was not approved by the Court and was not disclosed on MORs.[check this]

5

Activity Statement (Acct No. XXX-X6028-1-1)). On January 13, 1997, the initial cash deposit of $16,554.46, was used to purchase 635.976 shares of The Investment Company of America mutual fund. Tr's Ex. 61. On February 12, 1997, the 635.976 shares of The Investment Company of America were transferred into another mutual fund account bearing the names of Ru Than Turner and her parents. Tr's Ex. 61 p. 2, (Account Statement-1997, Acct. No. XXXXXXX7240).

13. On February 12, 1997, the shares of The Investment Company of America were again transferred to another mutual fund account held in Ru Than Turner's name alone under the Account number XXXX5818 (hereinafter, the "Ru Than Turner Investment Account"). Tr's Ex. 61 p. 3 (Account Statement-1997, Acct. No. XXXX5818),[7] The funds held in the Ru Than Investment Account were included in the 2002 and 2003 year-end statements from Edward Jones as part of a joint investment account held in Defendants' names only (Acct No. XXX-XXX91-1-4). Kevin Thompson, Investment Representative with Edward Jones Dep. p. 4 lines 17-24. Tr's Exs. 62 & 63.

14. In December 2002, just before the bankruptcy was filed, the Turner's joint investment account was valued at $39,109.50. Tr's Ex. 62. At the end of 2003, the Turner's joint investment account had a total value of $30,730.85, which is comprised of $55.47 in value from funds held at Edward Jones and $30,675.38 of value in shares of The Investment Company of

---

[7] Kevin Thompson testified that the Ru Than Turner Investment Account was reported to Defendants in statements from Edward Jones, but was not an account held with Edward Jones. The statements of account comprising Trustee's Exhibit 61, which are statements reporting activity from the Ru Than Turner Investment Account were provided to the Turners as a service from Edward Jones. *See* Tr's Ex. 61; Thompson Dep. pp. 5-6 and p. 7 line 20 – p. 8 line 22.

America fund. Tr's Ex. 63.

15. The joint investment account Acct No. XXX-XXX91-1-4 is not an IRA, Keogh or ERISA account. Tr's Ex. 60, Thompson Dep.at pp. 5-9. Although reported as part of the joint investment account, funds held in the Ru Than Turner Investment Account were reported as assets held outside of Edward Jones and were not in an IRA or other retirement account. Tr's Ex. 63 p. 2.

16. Defendants also maintained two IRA accounts with Edward Jones, which were opened in 1990. Tr's Ex. 62; Thompson Dep. p. 4 lines 10-12.

17. Defendants listed on their Original Schedule B, "IRA's, Keoghs & other pensions" with a value of $124,411.69. Tr's Ex. 2. This did not include the funds held in the joint investment account or the Ru Than Investment Account. Resp. To Tr's Motion Ex. B, Ru Than Turner Aff. ¶ 4(a).

18. In the March 2004 Stipulation, Defendants agreed to report in advance any transfers to insiders and any transfers of more than $1,000.00 out of the ordinary course of business. Tr's Ex. 3.

19. Five months later, on November 8, 2004, Ru Than Turner instructed an Edward Jones representative to redeem all of the shares in The Investment Company of America. Thompson Dep. p. 11 lines 12-21; Ru Than Turner Aff. ¶ 3. The shares were redeemed and a check from the fund manager for the balance of the account, $32,533.16, was issued payable to Ru Than Turner. Tr's Ex 61.

20. On November 12, 2004, the check was deposited into a checking account at Wells Fargo Bank jointly held by Defendants and Mrs. Schramfer. Tr's Mtn Exs 61, 62 and 63

(Account Statements Account No. XXXX5818); Resp. To Tr's Motion, Ex. C, Schrampfer Aff. ¶ 9.

21.  Mrs. Turner states that she and Mr. Turner were signatories on the Wells Fargo Account "for situations where my mother was unable to handle her own affairs or requested assistance to do so."  Ru Than Turner Aff. ¶ 5.

22.  The Defendants' Original Schedules disclosed only one checking account at Bank of America. Tr's Mtn Ex. 2.

23.  The Wells Fargo checking account was not disclosed in the Original Schedules filed in 2003 or in the 2004 Amended Schedules. Tr's Ex. 2.

24.  The November 2004 redemption of shares from The Investment Company of America and the transfer of the proceeds of the redemption to the Wells Fargo checking account were not authorized by the Court or disclosed in the bankruptcy either by further amending the schedules or in the MOR's or otherwise, as required by the March 2004 Stipulation and the Bankruptcy Code.

25. In November 2004, the following checks were issued from the Wells Fargo account; two bearing Ru Than Turner's signature and three bearing Mrs. Schrampfer's signature:

> a.  A check dated November 16, 2004 in the amount of $7,400.00 bearing Mrs. Schrampfer's signature was issued payable to Earnest Pastray.  The proceeds of the check were used to purchase a semi-truck for Turner Brothers Construction Inc., the Defendants' sons' business. Tr's Ex 52, Jason Turner Dep. p. 34; Tr's Ex. 53 (copy of cancelled check).
>
> b.  A check dated November 28, 2004 in the amount of $1,000.00 bearing Ru Than Turner's signature was issued payable to Greg Jones.  The proceeds of the check were used to purchase a pickup truck for Jason Turner. Tr's Ex. 52 , Jason Turner Dep. p. 35; Tr's Ex. 54 (copy of cancelled check).
>
> c.  A check dated November 17, 2004 in the amount of $1,578.09 bearing Mrs.

8

Schrampfer's signature was issued payable to Columbus Electric. The proceeds of this check were used to cover expenses for Jason Turner's business. Tr's Ex. 52, Jason Turner Dep. pp. 35-37; Tr's Ex. 55 (copy of cancelled check).

d. A check dated December 2, 2004 in the amount of $2,772.13 bearing Ru Than Turner's signature was issued payable to Columbus Electric. The proceeds of this check were used to cover expenses for Jason Turner's business. Tr's Ex. 52, Jason Turner Dep. at p. 36-37; Tr's Ex. 56 (copy of cancelled check).

e. A check dated November 19, 2004 in the amount of $9,418.84 bearing Mrs. Schrampfer's signature was issued payable to Chino Mine for $9,418.84 with a notation "Bar J and Farm." The proceeds of this check were used to cover expenses for Jason Turner's business. Tr's Ex. 52, Jason Turner Dep. p. 38; Tr's Ex. 57 (copy of cancelled check).

26. Checks totaling $3,772.13 from the Wells Fargo checking account were signed by Ru Than Turner. Tr's Exs. 54 and 56.

27. None of these payments were authorized by the Court or disclosed in the bankruptcy schedules, the disclosure statements, plans or in MORs.

**The Tyrone Property**

28. Title to a house located at 103 Bornito, Tyrone, New Mexico (the "Tyrone Property") was granted by Warranty Deed to Ru Than Turner on December 28, 2001 from her mother. Tr's Ex. 8.

29. In Defendants' Original Schedule A, Defendant Ru Than Turner is listed as the fee owner of the Tyrone Property. Tr's Ex. 2. Mrs. Schrampfer lives in the house. Schrampfer Aff. ¶ 6.

30. In the Amended Chapter 11 Schedules, the Defendants omitted the Tyrone Property from Schedule A. Tr's Ex. 4, Schedule A. In the Amended Statement of Financial Affairs Defendants listed the Tyrone Property as property held for another. Doc. 402; No. 03-10672.

31. At the Chapter 7 creditors meeting held on February 23, 2005, Defendants testified

that they omitted the Tyrone Property from their Amended Schedule A because they did not own

an interest in the Property. Tr's Ex. 9 pp. 11-12 (Transcript of 2/23/05 Creditors Meeting).

Defendants testified that Ru Than Turner had only a power of attorney from her mother.

Defendants made no reference to the Warranty Deed. Tr's Ex. 9, pp. 11-12.[8]

     32. Lucille Schrampfer states that she "entrusted" the Tyrone Property to her daughter,

Ru Than Turner with the understanding that Ru Than Turner would eventually sell the Tyrone

Property and either distribute the net proceeds equally among herself and her two brothers upon

Lucille Schrampfer's death or use the net proceeds to provide health care for Lucille Schrampfer

---

[8] The testimony at the Chapter 7 creditors meeting is as follows:
> Trustee: . . . What about 105 Bornate (sic) in Tyrone? That's yours, Ms. Turner; is that —
> Ms. Turner: It's my mother's house and she bought it with her money and is paying for it with her money. I'm her power of attorney.
> Trustee: Why is it listed here as your property?
> Ms. Turner: I couldn't tell you.
> Mr. Turner: Because Tal advised us – Mrs. [inaudible] is 88 years old; and she gave my wife power of attorney and wanted her so if she became incompetent, so if she lost her mind or something, that my wife would be able to take care of her.
> Ms. Turner: She had open heart surgery, and I think that's – my dad had Alzheimer's.
> . . .
> Trustee: Are you on the title on that house, at all?
> Ms. Turner What do you mean – no, I have brothers.
> Trustee: Are you on the deed with your mom on that house?
> Ms. Turner: I don't know. I can look, but I don't know.
> . . .
> Mr. Foy [Defendants' counsel]: Do you think she's on the title?
> Mr. Turner: I don't know. Wells Fargo did it.
> . . .
> Mr. Turner: [inaudible] she did a power of attorney, and it's through Wells Fargo, however they did it.
> Ms. Turner: No, we don't own it. Not even a piece of it. I'm just her power of attorney.
> . . .

Tr's Ex. 9 (Transcript of Proceedings, February 23, 2005; No. 7-03-10672 ML pp. 11-13).

should she become incapacitated.  Lucille Schrampfer has paid all of the mortgage payments on the Tyrone Property.  Schrampfer Aff. ¶ 6.

33.  Ru Than Turner states that at the time of the deed, she was unaware that she was on the title to the Tyrone Property.  Ru Than Turner's Aff. ¶ 7.

**Vehicles and Equipment**

34.  Defendants' Original Schedule B contained two exhibits itemizing 235 vehicles and pieces of equipment belonging to the bankruptcy estate.  Tr's Ex. 2, Exhibit A (equipment) and Exhibit B (vehicles) to Original Schedule B.

35.  According to insurance records from the Hotchkiss Agency of Silver City, New Mexico, Turner Brothers Construction, Inc., Defendants' sons' business, formed after the filing of this bankruptcy petition, carried insurance on 12 of the vehicles listed on the Original Schedules.  Tr's Exs. 2, 10 and 11.

36.  Mr. Turner states in his affidavit that at the end of  2004  his sons helped him finish a Phelps Dodge cathode hauling contract by insuring these vehicles because at the time, San Man could not get insurance and could not operate at the construction job without it. Resp. To Tr's Motion Ex. A, Joe Thomas Turner Aff. ¶ 7; Resp. To Bank's Motion Ex. D, Justin Turner Aff. ¶¶ 6-8.  After the construction work was finished, the sons dropped insurance coverage for these vehicles. Joe Thomas Turner Aff. ¶ 7.

37..  The Bank, which holds a security interest in Defendants' vehicles and equipment, attempted unsuccessfully to perform an appraisal of several vehicles and pieces of equipment belonging to the bankruptcy estate.  On April 23, 2004 the Bank filed a List of Equipment Whose Whereabouts Is Unknown (Doc. 416; No. 03-10672), listing 87 vehicles and pieces of

equipment that could not be located during the appraisal process.

38. Defendants filed a Response to Creditor First Savings Bank's Claim Concerning Missing Equipment on May 5, 2004 (Doc. 437; No. 03-10672) ("Response Regarding Missing Equipment"). In the Response Regarding Missing Equipment, Defendants stated that the location of 25 of those 87 items was unknown. Tr's Ex. 12 (Response Regarding Missing Equipment Ex A).

39. The Trustee's Report of Sale filed on May 9, 2005, states that 317 pieces of equipment were sold at the Trustee's sale for $560,880.00. See Doc. 755; No. 03-10672 (Trustee's Report of Sale). The Original Schedules list 235 pieces of equipment and vehicles. Tr's Ex. 2. At the first meeting of creditors, Mr. Turner testified that this equipment and vehicles had a value of $2.5 million. Tr's Ex. 1 (Transcript of Creditors Meeting 3/26/03) p. 21.[9]

40. Attached to the Defendants' August 2004 MOR, is a list of vehicles and equipment in which Defendants report that 80 items of equipment were sold to one of their sons, and 74 other items of equipment were stolen or missing. Tr's Ex. 13 (August MOR Doc. 576, No. 03-10672, filed October 26, 2004).

41. Mr. Turner states in his affidavit that he believes that some of the missing equipment was sold by his son Tracy Turner but admits that some of the equipment is simply missing.

_____

[9] The testimony is as follows:
By Unidentified Speaker:
Q: Mr. Turner, I was looking to your Exhibit A, which refers to machinery, fixtures and equipment. It goes on for six pages in small print, small tables. You list a value for that equipment of $2,500. It contains [inaudible] and other things. Is that a correct valuation?
A: No, sir, it's not. It should be 2.5 million.
      Mr. Young: We discussed this with Michelle Lombard. An amendment is in the
      works. The value should be 2.5 million. We're making that amendment. . . .
Tr's Ex. 1, p. 21 lines 6-16.

12

Response to Trustee's Motion Ex. A Joe Thomas Turner Aff. ¶ 14(b).[10]  With regard to vehicles, Mr. Turner states that San Man would purchase a large number of old and used trucks of the same year, make and model. Joe Thomas Turner Aff. ¶ 14(b). When one of those trucks would no longer run, "it was 'parted-out' to the rest of the trucks." Joe Thomas Turner Aff. ¶ 14(b). According to Mr. Turner, it is not unreasonable to conclude that a few of the old and used trucks were cannibalized in order to keep the rest of the old and used fleet running.  Joe Thomas Turner Aff. ¶ 14(b).

**Cattle**

42.  Defendants stated in their Original Schedule that they owned cattle and horses with the value of $108,249.00. Tr's Ex. 2.  The specific number of animals was not reported in the Original Schedule B. Tr's Ex. 2.

43.  At the Defendants' first meeting of creditors on March 26, 2003, Mr. Turner testified that Defendants owned approximately 700 head of cattle and that the value of approximately $108,000.00 listed on the Original Schedules was a conservative estimate. Tr's Ex. 1 p. 25 line 14 (Transcript of 341 Meeting 3/26/03).[11]  Schedule B was not amended. Tr's Ex. 4.

---

[10] Mr. Turner's affidavit states the following:
Tracy Turner . . . sold a whole host of equipment.  It is believed that the equipment sold by Tracy Turner is some of the equipment that is claimed as lost.

Joe Thomas Turner Aff. ¶ 14(b).

[11] Mr. Turner's testimony at the creditors meeting is as follows:
By Mr. Roggow:
Q: Mr. Turner, could you tell me how many cattle you have?
A.  Yes, sir.  We have approximately – cows and calves, approximately 700 head.
Q: And that's what you own?
A: Yes, sir.
Q: Your figure is 108,000.  That might be a little conservative?

13

44. Defendants' First Amended Disclosure Statement filed on December 8, 2003 states that Defendants owned at that time approximately 950 head of cattle having a value in excess of $500,000.00. *See* Doc. 250 p. 15.[12]

45. On July 16, 2004, Mr. Turner testified at a Rule 2004 Examination that although he did not have a good feel for it, he thought roughly 400 calves had been born in 2003. Bank's Ex. 2 p. 67 line 8 (Transcript of 2004 Examination 7/16/03 ).[13]

46. On July 14, 2004, the Bank filed a Motion to Compel Discovery (the "Motion to Compel"), arguing that Defendants had failed to comply with the disclosure requirements of the March 2004 Stipulation, and that the Bank was seeking information regarding the number of cattle because it suspected that Defendants had sold cattle without remitting the proceeds to the Bank. The Bank also requested an accounting of cattle from the date the bankruptcy petition was filed forward to the date of answering. Doc. 478 No. 03-10672.

---

A: Well, sir, the value of cattle going up and down and I tried to be conservative on all my estimates on the value of the ranches, also the value of the cattle.
Tr's Ex. 1, p. 25.

[12] The Amended Disclosure Statement states:
The Turners' Beef Herd on the Cow Springs and Thompson Canyon Ranches and Moody Farms consists of approximately 500 mother cows @ $700.00 per head, 425 calves @ $350.00 per head; 25 breeding bulls @ $1,200.00 per head. The ranches also have 9 horses @ $2,000.00 per head. Doc. 250, No. 03-10672,p. 15, Tr's Ex.

[13] Mr. Turners testimony is as follows:
Q: Okay. Well, do you have any calves presently?
A: Yes, I do.
Q: How many calves do you have?
A: I don't have a good feel for it. They're born every day.
Q: Well, roughly.
A: Four hundred head.
Bank's Ex. 2 p. 67 lines 4 - 11.

47.  After a hearing on the Motion to Compel, the Court issued an Order on First Savings

Bank's Motion To Compel Discovery and for Sanctions (the "Order Compelling Discovery")

(Doc. 561, No. 03-10672).  In the Order Compelling Discovery, the Court ordered Defendants to

fully answer both Interrogatories 1 and 2.

48.  The interrogatories and the answers provided by Mr. Turner are as follows:

> 1.  Please disclose the number of cattle the Debtors owned at the date of the filing
> of the bankruptcy petition, identifying the cattle by category (bull, mother cow,
> calf, etc.).
>
> Answer: I do not know the exact amount as there was no way to inventory at that
> time of year.
>
> 2.  Please disclose any and all increases (calf production) to the Debtors livestock
> herd from the date of the filing of the Debtors bankruptcy to the date of
> answering:
>
> Answer: I do not know.

Bank's Ex. 5.

49.  At the hearing on conversion to Chapter 7, held on December 10, 2004, Mr. Turner

testified that although the First Amended Disclosure Statement stated that Defendants owned

approximately 950 head of cattle, his own records of cattle sales indicate that only 352 head of

cattle had been sold at the end of 2004.  When asked about the remaining 598 head for which

there were no records of sale, Mr. Turner's only explanation was that his sons managed the

ranches where the cattle were located and he was focusing on the construction business at the

time. Bank's Ex. 6 (Transcript of Hearing held on December 10, 2004) pp. 195 line 15 – p. 203

line 10; Tr's Ex 6.[14]

---

[14] Mr. Turner's testimony:
Q: So you had 950 animals you represented to the Court on 12/8/03?
A: Yes.

Q: Correct? Sir, I would like you to go to your discovery answers which are – and we've looked at these before, Exhibit 18. . . . Okay, interrogatory number one, you remember, don't you, that First Savings Bank asked the Court to compel you to answer this discovery regarding the cattle?

A: Yes, sir.

Q: Question one asked you to disclose the number of cattle that you owned at the date of the filing of your petition and identifying the cattle by bull, mother cow, calf, et cetera. What was your answer?

A: I don't know the exact number.

Q: So you gave no answer. . . .

. . .

A. Mr. Roggow, the last time I said about something you nailed me to the wall on it, so I want to be exactly precise when I answer your questions.

. . .

Q: And so you don't keep records of calf production sales so that you can file your income tax returns or anything?

A: Yes, sir, I do, but you'll remember, I lease the ranch and the cattle to the boys as they were purchasing that pre-petition.

Q: Mr. Turner, do you remember at your first meeting of creditors having no problem disclosing that you had 700 head of cattle approximately at that time?

A: I said "approximately."

Q: And in your first amended disclosure statement you said, "950"; isn't that correct?

A: I don't remember what – exactly what it was.

Q: Well, we were just looking at it about a minute ago, but don't turn the page, but you're telling me you had no way of answering this, had no idea –

A: Well, Mr. Roggow, this is 18 months later on four different ranches, it's difficult to remember exactly.

Q: And, Mr. Turner, if you'll go further into your answers where you disclose specific sales, and you have the livestock buyer sheets there indicating how many head of cattle you sold, and I am going to ask you to start – and you had those documents thankfully in chronological order. I'm going to ask you to start with your December 3, 2003, your first December sale.

. . .

Q: So if your disclosure to the Court was accurate when you said 950 back on December 8th and if you sold – according to you this is your entire sale out, 352, we're 598 animals short, aren't we?

A: Well, your math is much faster than mine.

Q: Those are your records, aren't they, sir?

A: Yeah, they're my estimates of how many cattle I had.

Q: Being off by a factor of 200 percent, would that concern you on your estimate?

A: It would if I would have been managing the ranches.

Q: How can you manage a ranch, sir, if you don't know how many cattle you have, isn't –

16

50.  In his affidavit, Mr. Turner states that the real issue is his own mistake in identifying an exact number of cattle in the amended reorganization plan.  Def's Resp. to Bank's Motion Ex. E, Joe Thomas Turner Aff. ¶ 6.

51.  Mr. Turner also states in the same affidavit that the representation that Defendants owned 950 head of cattle was an estimate "for purposes of having the Court adopt a plan of reorganization that allowed me and Ru Than Turner to continue in our ranching operations." Def's Resp. To Bank's Motion Ex. E, Joe Thomas Turner Aff. ¶ 2.

52.  Mr. Turner explains that he did not realize the true number of cattle held until the entire herd was sold at the end of 2004 and that the actual sales proceeds were in excess of the stated value of $108,000.00 in the schedules. . Def's Resp. To Bank's Motion Ex. E, Joe Thomas Turner Aff. ¶¶ 2 – 7.

53.  Justin Turner's affidavit states, his father allowed he and his brother Jason to "sell cattle without supervision as we saw fit."  Resp. To Tr's Motion Ex. D, Justin Turner Aff. ¶ 4.

**4T, LLC**

54.  4T, LLC was a limited liability company formed on June 21, 2000.  The original members were Joe Thomas Turner and Defendants' three sons, Tracy, Jason and Justin. Bank's Ex. 10 Kay Stone Dep. p. 32.[15]  *See* Articles of Organization For 4T Company, LLC, Def's Resp.

---

A: I wasn't managing the ranches, Mr. Roggow.
Q: Your sons were for you; is that correct?
A: Yes.
Bank's Ex. 6, Transcript of Proceedings, December 10, 2004, p.196 line 18 – p. 202 line 10.

[15] Ms. Stone had been Joe Thomas Turner's accountant for several years before the bankruptcy.  Ms. Stone prepared all of the MOR's in the Chapter 11. Bank's Ex. 10, Stone Dep. p. 18, lines 13-25; August MOR filed 10/26/04 (prepared by Stone, McGee & Co.).

to Bank's Motion Ex. F p. 10-13.[16]

55.  4T, LLC was formed to bring Defendants' three sons "into ownership of different things in San Man . . ." Bank's Ex. 7, Transcript of Joe Thomas Turner's 2004 Examination 7/16/03  p. 99.

56.  Paragraph 18a  of the Amended Statement of Financial Affairs requests a listing of the following:

> If the debtor is an individual, list the names, addresses, taxpayer identification numbers nature of the businesses, and beginning and ending dates of all businesses in which debtor was an officer, director, partner or managing executive of a corporation, partnership, sole proprietorship, or was a self employed professional with the six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent of more of the voting or equity securities within the six years immediately preceding the commencement of this case.

57.  In response to paragraph 18a, Defendants reported an interest in "4T Company, " with a beginning and ending date reported as 06/01/2000, and with the nature of the business listed as "Construction and management of Texaco facility."  Doc. 402; No. 03-10672 ¶ 18a.

58.  In March 2002 Mr. Turner, in discussions regarding his 2001 tax return, told his accountant that he no longer had an interest in 4T, LLC and that each of his sons owned 1/3 of the entity. Bank's Ex. 10 Kay Stone Dep. p. 31.  There was no documentation given to the Turner's accountant concerning this transfer of Joe Thomas Turner's interest in 4T, LLC, and no gift tax return was prepared in connection with the transfer of Joe Thomas Turner's interest in 4T, LLC to his sons. Bank's Ex. 8, Kay Stone Dep. p. 31 line 22 - p. 32 line 15.

59.  Defendants' Response to the Bank's Motion contains a copy of a letter dated August

---

[16] According to the Articles of Organization (Defs' Resp. To Bank's Motion Ex. F) the name of the company was "4T Company, LLC;" however, it is referred to throughout the pleadings as 4T, LLC; thus the Court will refer to it as such.

18

27, 2001 in which Mr. Turner agreed "to sell [his] part of 4T, LLC to Tracy Turner, Jason Turner and Justin Turner, for the sum of $1,000.00 each." Defs' Resp. To Bank's Motion Ex. F p. 15.

60.  On August 28, 2001, one day after the transfer of Mr. Turner's interest in 4T, LLC to his sons, 4T, LLC formed a partnership with two other entities named Three Saints, LLC and Double H Land Partnership. Bank's Ex. 9 (Tierra De Plata Partnership Agreement). The Tierra De Plata partnership was formed to acquire a 50 acre parcel of property outside of Silver City, New Mexico, and then to trade a portion of that property to acquire commercial property in the town of Silver City. Bank's Ex. 9.

61.  The Tierra De Plata Partnership Agreement stated

Due to pending negotiations and the structure of financing the 50 acres was acquired by Three Saints LLC and the development expenses have been borne by Joe Thomas Turner d/b/a San Man Construction.

 Bank's Ex. 9 ¶ 22.

62.  According to its partnership agreement, Tierra De Plata planned to borrow money to reimburse San Man and Three Saints, LLC for expenses incurred by each.  Bank's Ex 9 ¶ 22; *see also* Bank's Ex. 7 p. 99 (Joe Thomas Turner 2004 Exam).  Tierra De Plata obtained financing from AmBank and paid approximately $300,000 to San Man for the construction work. Affidavit of Gregory M. Carasco, managing partner of Tierra De Plata, ¶¶ 5 - 7.

63.  4T, LLC owed a debt to Defendant Joe Thomas Turner of approximately $157,000.00.  Bank's Ex. 10, Kay Stone Dep. p. 32, lines16-19.  As of February 28, 2006, that debt had not been repaid. Kay Stone Dep. p. 32, lines 20-22.  Ms. Stone testified that she reported the debt on Joe Thomas Turner's tax return as a personal asset, and as part of a sole proprietor's capital in a journal entry on internal financial records. Kay Stone Dep. p. 55-56.  In

19

Joe Thomas Turner's internal statement of assets and liabilities, as of the month before the

bankruptcy filing, the debt was being carried as a note receivable. Kay Stone Dep. p. 55 lines 5-

12; p. 56 lines 2-18. 4-T, LLC reported this liability on its 2002 and 2003 tax returns. Kay Stone

Dep. p. 16, lines 1-9; p. 17, lines 4-22.[17]

---

[17] Ms. Stone's testimony is as follows:
Q [Mr. Roggow]: How was [the note from 4T, LLC] characterized by Mr. Turner's tax
return, Mr. Turner's tax return?
A: Tom is a sole proprietor. There is no balance . . .
A: I – well, basically, put it into beginning proprietor's capital, yes.
Q: Okay. But that would have to be the beginning proprietor's capital on 4T, LLC, right?
A: No, that would be the beginning capital on – this is a reduction of Mr. Turner's
beginning capital, because a receivable is a debit balance. So, to clean up those
financials, we get rid of the receivable, move it into his equity and that's what this entry
basically did.
Q: Okay.
Mr. [sic] Stone: It was a personal asset.
The Witness: Right.
Q: (by Mr. Roggow) Okay. But to the best of your knowledge, there was never any $157
– or $160,000 that came and was paid to Mr. Turner?
A: No, no, there was not. This was simply, merely to clean up the records, to start
presenting those to the bankruptcy court.
Q: So, if we believe the prior reporting, the '02 reporting, that there was $157,000 plus
that was due to Mr. Turner for 4T, LLC that that either gets paid, forgiven; is there
another thing we can do with it?
A: No, as far as I can see, this was just a journal entry to clean this up. But as far as I can
see, that money was never paid to him, to my knowledge. And never came through the
books as being any type of payment to him.
Q: But as of December 2002, the month before he filed bankruptcy, at least on his
internal statement of assets and liabilities, it was being carried as an asset of his, a note
receivable –
A: As a receivable, that is correct.
Q: – for 4T, LLC?
A: Yes, that is correct.
Q: And, of course –
A: Right, it was a personal asset. We were just trying to get it so that it was the San Man
assets that were – that were disclosed, and it was personal. That entry was to merely
clean up the – clean it up.
Q: It was cleaning up the books?
A: Yes.
Q: But you're not aware of any money ever having been paid from 4T to Mr. Turner?

64. This note receivable was not reported in the bankruptcy.[18]

65. On December 31, 2002 4T, LLC sold its interest in the Tierra De Plata Partnership to Three Saints, LLC for $100,000.00. Defs' Resp. To Bank's Motion Ex. H, Carasco Aff. ¶ ¶ 2-3; and Ex. H-3 (assignment of membership interests). The sale agreement states that the only members of 4T,LLC were Jason, Justin and Tracy Turner. Defs' Ex. H.

66. Jason Turner testified that he received no money from 4T, LLC. Bank's Ex. 14, Jason Turner Dep. (2/2806) p. 11.

67. During a deposition taken on June 29, 2006, Jason Turner was presented with a copy of a cashier's check for $100,000.00 dated January 27, 2003, two days before this bankruptcy was filed, written on an account held by Three Saints payable to 4T, LLC. Bank's Ex. 14, Jason Turner Dep. (6/29/06) p. 12; and Ex. 47 to Jason Turner Dep. (6/29/06). A signature for "4-T LLC Jason Turner" appears on the back of this check, but upon examination of the endorsement, Jason Turner stated he might have signed it but did not recall signing it. Bank's Ex. 15, Jason Turner Dep. p. 19. When questioned about the check, Jason Turner stated that he was not surprised that the check was deposited into an account at AmBank held by himself and his brother Justin. Bank's Ex. 15, Jason Turner Dep. p. 19. When asked what happened to the proceeds of this check, Jason Turner testified as follows:

A: No, I'm not aware of any money.
Q: And there was no forgiveness of debt that you've done on any sort of tax returns?
A: No.
Kay Stone Dep. pp. 32, 55-56, Tr's Ex. 10.

[18] In his affidavit, Mr. Turner states that he produced a balance statement showing the note receivable in his February 2003 report to the Trustee. Joe Thomas Turner Aff. ¶ . The February 2003 MOR contains no report of the note receivable. No other proof of this disclosure was offered by Defendants.

Q: What was done with the proceeds of that $100,000, Exhibit 47?
A: I don't know.
Q: Did you give it to your father?
A: Probably.
Q: Okay. Why did you do that?
A: I felt like it.
Q: Because you owed him money?
A: No.
Q: Because he did all the work on the 4T, LLC property?
A: Possibly.

Tr's Ex. 52 at p. 21; Bank's Ex. 14, Jason Turner Dep. (6/29/06) p. 21 lines 4-18.

68.  Out of the proceeds of the $100,000.00 cashier's check, San Man received

$76,700.00 on January 28, 2003, one day before the bankruptcy filing. Bank's Ex.16, Jason

Turner Dep. (6/29/06) pp. 30-31 (discussing a check for $76,700.00 written to San Man).[19]

69.  The Original Schedules do not report $76,700.00 in the San Man checking account

or as cash on hand. Tr's Ex. 2 (Schedule B).

70.  Mr. Turner states that the $76,700.00 was a gift from his sons to help his business

stay viable. Def's Resp. To Bank's Motion Ex. E, Joe Thomas Turner Aff. ¶ 9.

71.  No amendments to the Defendants' schedules or statements reflect the $76,700.00

pre-petition payment.

70.  The Chapter 7 Trustee has filed an adversary proceeding seeking avoidance of

---

[19] Jason Turner's testimony is as follows:
Q: Thank you. Going back to Exhibit Number 50, sir – and I'm looking at the third to the last page of that exhibit. Check number 1508, to San Man for $76,700. Why did you write a check of $76,700.00 to San Man?
A: It looks like it was to the bank.
Q: Where it says, "Pay to the order of San Man," you're saying that was to the bank?
A: No, I didn't say that.
Q: What makes you believe it was to the bank?
A: Because there's a bank number on the bottom.
Q: And it says deposit, right?
A: No, memo, I might have gave him some money.
Bank Ex. 16 p. 30 line 19 – p. 31 line 8.

transfers of estate property and turnover of estate property including the proceeds of the Ru Than Turner Investment Account, the Tyrone Property, and the proceeds of the sale of 4T, LLC's interest in the Tierra De Plata partnership.  *See Montoya v. Lucille Schrampfer, Joe Thomas Turner, Ru Than Turner, Turner Brothers Construction, Inc., Justin Turner, Katherine Turner, Jason Turner, Julie Turner, Tracy Turner, Kerry Turner, 4T, LLC and Linda Bloom,* Adv. No. 06-1161M, Complaint (Doc. 1).

Discussion

Pursuant to Fed. R. Civ. P. 56, made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7056, summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Material facts are those which "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  After the movant has made a properly supported summary judgment motion, "the nonmovant [has] the burden of setting forth specific facts showing the existence of a genuine issue of fact for trial."  *Anderson,* 477 U.S. at 251 (1986).  In determining whether summary judgment is appropriate, the Court construes the evidence in the light most favorable to the party opposing summary judgment.  *Jenkins v. Wood,* 81 F.3d 988, 990 (10th Cir. 1996).

## Section 727(a)(5) Failure to Explain Loss of Assets

Section 727(a)(5) provides that "[t]he court shall grant the debtor a discharge, unless . . .

23

the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities. . . ." 11 U.S.C. § 727(a)(5).  The plaintiff objecting to a debtor's discharge under § 727(a)(5) has the burden of proving by a preponderance of the evidence that a loss or shrinkage of assets actually occurred.  However, once the plaintiff has introduced some evidence of the disappearance of substantial assets, the burden shifts to the debtor to explain satisfactorily the losses or deficiencies. *United States v. Dorman (In re Dorman),* 98 B.R. 560, 571 (Bankr. D. Kan.1987) (stating that once objecting party meets initial burden, then burden shifts to debtor to explain the loss or deficiency of assets in satisfactory manner); cited in *The Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 618 (10th Cir. BAP 2001)  *aff'd,* 35 F. App'x 811 (10th Cir.2002). Unlike § 727(a)(2), the element of "intent" to hinder, delay or defraud creditors is not a required element in a cause of action under § 727(a)(5). *See In re Phouminh,* 339 B.R. 231, 248 (Bankr. D. Colo. 2005)(granting summary judgment on § 727(a)(5) claim); and *Ernst v. Walton (In re Walton)*, 103 B.R. 151, 155 (Bankr. S.D. Ohio 1989) (same).

To be satisfactory, the debtor's explanation for a diminution of assets must be specific and corroborated.  A general or suggestive explanation as to the reasons assets became depleted falls short of the mark. *Bell v. Stuerke (In re Stuerke),* 61 B.R. 623, 626 (9th Cir. BAP 1986) (citing *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir.1984)) ("Vague and indefinite explanations of losses that are based on estimates uncorroborated by documentation are unsatisfactory.").  To obtain bankruptcy discharge, debtors cannot respond to questions about their financial activities with a cursory "I don't know" or "I did not keep records." *In re Morris*, 302 B.R. 728, 743 (Bankr. N.D. Okla. 2003) (citation omitted).  "The explanation must convince the court of the debtor's good faith and businesslike conduct. Explanations consisting of mere

generalities and founded upon nothing by way of verification or affirmation in books, records or otherwise [are] not satisfactory." *Walton,* 103 B.R. at 155.

The Trustee and the Bank argue that several types of assets were lost or missing without a sufficient explanation by Defendants. These assets are in the following categories: 1) vehicles and equipment used in construction; 2) cattle; and 3) funds received just before and just after the bankruptcy was filed on January 29, 2003.

### Collateral Estoppel Effect of the Conversion Order

The Trustee and Bank argue that the Court may grant summary judgment on this count denying discharge under § 727(a)(5) because has already found in the Conversion Order that vehicles and equipment were missing and that Defendants made little or no effort to locate them. Specifically, the Court found in the Conversion Order that according to the August 2004 MOR, Defendants sold 80 items of equipment to their son Tracy Turner and that 74 other items were either missing or stolen. In the Conversion Order the Court found that Defendants had made little or no effort to recover them and had failed to account for the proceeds from the sale of these items. These findings were based on Defendants' response to the Bank's April 2004 List of Missing Equipment regarding 87 items of equipment and vehicles, in which Defendants state that the location of 25 out of 87 items was simply unknown, and upon the information given in the August 2004 MOR.

Collateral estoppel has been used to preclude the re-litigation of findings previously made in bankruptcy that are applicable to denial of discharge actions. In *Enterprise Nat'l Bank v. Wallace (In re Wallace)*, 191 B.R. 925 (Bankr. M.D. Fla.), the Court had previously denied the debtor's motion to convert the case from a Chapter 7 to a Chapter 11 bankruptcy finding that the

debtor had engaged in a "pattern of pre- and post-petition transferring, removing, and concealing property within the year before the filing . . . and, after the filing of the case that was property of his estate." *Id.* at 928. The court determined that the debtor was precluded from re-litigating the finding that he transferred, removed or concealed property of the estate in the denial of discharge action under § 727(a)(2). However, the Court granted only partial summary judgment because the element of intent, remained at issue. *Id.* ("The specific intent required by Section 727(a)(2)(A) and (B), . . . requires evidentiary development at trial.").

Similarly, this Court's earlier findings that there were missing assets that Defendants made minimal effort to identify or recover are applicable for purposes of denial of discharge under § 727(a)(5). However, whether Defendants sufficiently explained the loss of assets was not squarely before the Court at the time of the conversion. Moreover, the Court's finding of Defendants' failure to locate assets or proceeds thereof is not a finding that Defendants failed to explain the loss of assets. Therefore, the Conversion Order does not serve to preclude Defendants from litigating the sufficiency of their explanation in this § 727(a)(5) action. *See Shovelin v. Central New Mexico Elec. Co-op, Inc.*, 115 N.M. 293, 297, 850 P.2d 996, 1000 (1993) (requiring for collateral estoppel purposes that the issue was actually litigated in the prior adjudication).

The Trustee and the Bank maintain that the undisputed facts in addition to the findings in the Conversion Order show that Defendants have failed to satisfactorily explain the missing vehicles and equipment. First, the Trustee and Bank assert that Defendants' answers to interrogatories and their Response Regarding Missing Equipment stating that vehicles and equipment has been sold or is missing or stolen, is not a sufficient explanation. In addition, Mr.

26

Turner's affidavit adds to his explanation by stating that Tracy Turner, "sold vehicles out from under him." Resp. To Tr's Motion Ex. A, Joe Thomas Turner Aff. ¶ 14. Mr. Turner also states that some vehicles were "parted out" to provide replacement parts for other vehicles and that this might explain the missing vehicles. Joe Thomas Turner Aff. ¶ 14. The Court finds that these vague answers provided both at the bankruptcy conversion stage and at this stage are unsatisfactory. The undisputed facts contained in the Conversion Order finding that Defendants' assets are missing coupled with the inadequate explanation offered by Defendants in their responses to interrogatories and in their affidavits in response to the Motions, lead the Court to conclude Defendants have failed to satisfactorily explain the loss of equipment and vehicles.

**Loss of Cattle**

The Trustee and the Bank argue that they have met their burden to show that cattle belonging to estate are missing. Joe Thomas Turner testified at the original creditors meeting that Defendants owned approximately 700 head of cattle. In the December 2003 First Amended Disclosure Statement, Defendants stated that they owned approximately 950 head of cattle. In July 2004, Defendants were ordered to respond to the Bank's interrogatories regarding the number of cattle at filing and to give an accounting of cattle increases and sales since the filing. In response, Joe Thomas Turner stated that he didn't know the exact amount of cattle at the time of filing because "there was no way to inventory at that time of year." As to cattle increases after filing until mid- 2004, Mr. Turner stated in his answers to interrogatories that he simply did not know. In testimony at the hearing on conversion, Mr. Turner testified that he did not manage the ranches where the cattle were kept, that his sons managed those ranches and that he had no memory how many cattle he owned at filing and could not testify as to the number of cattle

27

owned at the time of the hearing.

In the Response to Bank's Motion, Defendants argue that the statements made at the creditors meeting and in the First Amended Disclosure Statement were estimates in an attempt to show that they could reorganize and continue to operate the ranching business. Joe Thomas Turner Aff. ¶ 2.[20]  In another statement, Mr. Turner testified that he made a mistake in being too specific in the Amended Disclosure Statement, since at the time, he was estimating the number of cattle.  Joe Thomas Turner Aff. ¶ 6.[21]  Mr. Turner states that in retrospect, he should have "either alone or with the Bank" conducted a detailed count of cattle before reporting the number of cattle that he owned. Joe Thomas Turner Aff. ¶¶ 2-6.  Mr. Turner states that his sons, Jason and Justin, ran the two ranches and sold cattle "without interference or advice from me." Joe Thomas Turner Aff. ¶ 6.[22]  Mr. Turner states that it was not until all of the cattle were sold that he became aware that he had over-estimated the number of cattle owned.  Joe Thomas Turner Aff. ¶ 7.  Mr. Turner states, however, that the number of cows can be ascertained from the sales

---

[20] Mr. Turner states,
> Concerning the allegations of cattle that are unaccounted, there are not 598 animals "unaccounted for."  The totals in the reorganization plan were estimates for the purpose of having the Court adopt a plan of reorganization that allowed me and Ru Than Turner to continue in our ranching operations.  The Court did not adopt the plan.  The animals claimed "unaccounted for" were account estimates and not based upon any hard cattle count.

Resp. To Bank's Motion Ex. E, Joe Thomas Turner Aff. ¶ 2.

[21] Mr. Turner states,
> It is my opinion that the real issue is my mistake in identifying an exact number of cattle in the amended reorganization plan.

Resp. To Bank's Motion Ex. E, Joe Thomas Turner Aff. ¶ 6.

[22] Justin Turner states, "[m]y dad let Jason and I sell cattle without supervision as we saw fit.  Jason, my brother, and I were the hands on managers of the ranches and of the cattle."  Jason Turner Aff. ¶ 4.

28

records, checks for payment of cattle purchased, from sales slips from cattle auction houses, and inspection reports from the livestock inspector. Joe Thomas Turner Aff. ¶ 8. The Defendants' explanation for the large discrepancy in the number of cows reported and the number actually sold is summed up in this statement: "The animals claimed 'unaccounted for' were account estimates and not based upon any hard cattle count." Joe Thomas Turner Aff. ¶ 2.

The Bank argues that the reported numbers of cattle in the Original Schedules and in the First Amended Disclosure Statement, compared with the actual number sold, lead to the conclusion that a large number of cattle are missing without explanation. The Bank argues that it has never received an accurate accounting of the number of cattle owned at the time of filing or of the proceeds from cattle sales.

As for the number and location of the other cattle, Defendants argue that the cattle are not missing because the original number given at the initial creditors meeting and the number given in the First Amended Disclosure Statement were over-estimates. Defendants contend that the true number of cattle owned was revealed when all of the cattle were ultimately sold. According to Defendants, the Court should deny summary judgment on this claim because no cattle were actually missing. This explanation after the fact is insufficient to rebut the initial showing by the Trustee and the Bank that no true accounting of cattle was ever provided by Defendants.

The Original Schedules contain a value of approximately $108,000.00 for cows and horses. However, Mr. Turner's estimate of 700 head at the creditors meeting means that this valuation was not just conservative but grossly inadequate.[23] Several months later, in their First

_____

[23] In the First Amended Disclosure Statement, values per head were listed as follows: mother cows – $700.00 per head; calves – $350.00 per head; and breeding bulls – $1,200.00 per head. Even if the entire valuation of $108,000.00 was for calves, at $350.00 per head, the value of $108,000.00 would yield only 308 head of cattle, a far cry from the 700 head estimate given at

Amended Disclosure Statement, Defendants stated that they owned 950 head of cattle. Mr. Turner claims that this estimate was for the purpose of showing that reorganization of the ranching operation was possible. A few months later; however, Mr. Turner, in response to discovery requests, stated that he did not know and could not determine the number of cattle owned at filing or afterward. This statement blatantly contradicts his testimony at the creditors meeting as well as the initial valuation of $108,000.00 in the schedules.

Even without the statement from Mr. Turner that he did not know and could not find out how many cattle he owned, which he describes as made in response to being ridiculed by the Bank at the hearing, the Court must conclude that cattle were missing. The number of cattle reflected in the sales records is so disparate from the number of cattle in sworn statements, both in the testimony and in the First Amended Disclosure Statement, that the only reasonable inference is that there were more cattle than were ultimately accounted for. Mr. Turner's explanations for this disparity fall short. Mr. Turner's reason for not accounting for cattle in the answers to the interrogatories that he was trying to avoid being "nailed" by the Bank's counsel, is a wholly inadequate response. Neither can Mr. Turner justify the disparity by stating that his sworn statements were mere estimates without a hard cattle count. Mr. Turner might now wish that he had done a detailed count of cattle, but this is too little, too late. Finally, Mr. Turner may not justify all of his answers by stating that the ultimate sale of cattle brought more value into the estate than the original estimated value of $108,000.00 contained in the schedules. "No harm, no foul" is not a sufficient explanation.

The Court concludes that Defendants should be denied a discharge under § 727(a)(5) for

---

the creditors meeting.

failure to explain the loss of cattle during the bankruptcy proceedings. To be sufficient, "[t]he explanation must appear reasonable such that the court 'no longer wonders' what happened to the assets." *In re Wolfson*, 139 B.R. 279, 289 (Bankr. S.D. N.Y. 1992) (granting summary judgment denying discharge under §727(a)(4)). Considering the contradictory assertions by Mr. Turner, the Court is in the dark, along with the Bank, as to the number of cattle belonging to the bankruptcy estate. "Vague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory." *Id.*, quoting *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir.1984).

Even if the Court were to accept Mr. Turner's explanation that there were no cattle missing, just over-estimates of the number owned, this type of blatantly false information in the schedules, in sworn testimony, and in the First Amended Disclosure Statement signed under penalty of perjury, would constitute false oaths under § 727(a)(4). Under the facts presented, either the Defendants made a false oath, i.e. the figures given were over-estimates for the purpose of convincing creditors to vote in favor of the Defendants' plan of reorganization; or there are missing cattle, i.e. the number given at the creditors meeting is twice as many as the number of cattle sold, without an adequate explanation. Under either scenario, denial of discharge will result.

### Cash Received From Billings and 4T, LLC Before and After Bankruptcy Filing

Defendants do not dispute that San Man received $76,700.00 of the proceeds from the sale of their sons' interest in 4T, LLC. These funds were received the day before bankruptcy was filed, but no information is reported in the Original Schedules or in the Statement of Financial Affairs as to where these funds were deposited or how they were used. Mr. Turner

characterizes this transfer of $76,700.00 from his sons as a gift to help San Man; however, Defendants are wholly without an explanation as to what happened to this asset. To earn a discharge a debtor is required to cooperate with the Court and all parties in interest. "[C]omplete disclosure is the touchstone in a bankruptcy case." *Wolfson*, 139 B.R. at 289. There is no explanation as to what happened to those funds in the Defendants' bankruptcy filings.

In its Conversion Order, the Court found that in February 2003, just after the bankruptcy filing, Gerald Billings loaned $50,000.00 to Defendants, which was not reported. No Court approval of the loan was obtained. Mr. Turner's affidavit explains as follows: "the money given by Gerald Billings, Sr. to me, which was placed into the San Man Account in order to help San Man reorganize and repay creditors, was a gift, not a loan. Resp To Tr's Motion Ex. A, Joe Thomas Turner Aff. ¶ 16. Whether the money was a gift or a loan, the receipt of these funds was not reported in the subsequent MOR's or in the schedules, and there is no verification on the record that Mr. Turner used these funds to pay creditors. *See* Docs. 38, 58 and 59 (February and March MORs). Creditors are entitled to know the source and disposition of all funds used by a debtor during a bankruptcy case. Therefore, based on the lack of an explanation as to the disposition of the $76,700.00 and the $50,000.00, the Court will grant summary judgment and deny discharge under § 727(a)(5).

**Section 727(a)(4) False Oath**

In seeking the denial of a discharge pursuant to § 727(a)(4), the objecting party must establish by a preponderance of the evidence 1) that the debtor made a statement under oath; 2) that the statement was false; 3) that the debtor knew the statement was false; 4) that the debtor made the statement with fraudulent intent; and 5) that the statement related materially to the

32

bankruptcy case. *Syngenta Seeds, Inc. v. Eigsti (In re Eigsti)*, 323 B.R. 778, 783-84 (Bankr. M.D. Fla. 2005). For purposes of § 727(a)(4), a debtor's petition, schedules, statement of financial affairs, statements at the creditors meeting, and testimony at Rule 2004 examinations all constitute statements made under oath. *John Deere Co. v. Broholm (In re Broholm),* 310 B.R. 864, 880 (Bankr. N.D. Ill. 2004). The purpose of § 727(a)(4)(A) is to assure that adequate information is available to those interested in administration of the estate without the need of examinations or investigations to determine whether the information provided is true. *United States v. Craig (In re Craig)*, 252 B.R. 822, 828-29 (Bankr. S.D. Fla. 2000). A statement is material under this provision when it bears relationship to debtor's business transactions or estate, or concerns discovery of assets, business dealings, or existence and disposition of debtor's property. *Structured Asset Services, LLC v. Self (In re Self)*, 325 B.R. 224, 249 (Bankr. N.D. Ill. 2005). The fraudulent intent element of § 727(a)(4) can be established in one of two ways 1) that the debtor has engaged in a pattern of concealment; or 2) that the debtor had a reckless indifference for the truth.[24] *Craig*, 252 B.R. at 829 (citation omitted); *The Cadle Company, Inc. v. Leffingwell (In re Leffingwell)*, 279 B.R. 328, 350 (Bankr. M.D. Fla. 2002).

### **The Tyrone Property**

Ru Than Turner was the title holder to the Tyrone Property, a fact admitted in Defendants' Original Schedules. However Defendants chose to omit this ownership interest from their Amended Schedules and reported it as property held for another in their Amended

---

[24] Stated another way, not caring whether some representation is true or false-the state of mind known as "reckless disregard"is, at least for purposes of the false oath provision, the equivalent of knowing that the representation is false and material. *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998)(upholding a grant of summary judgment denying discharge under § 727(a)(4)).

33

Statement of Financial Affairs.  At the Chapter 7 creditors meeting, Defendants falsely testified that they did not own any interest in the Tyrone Property without disclosing that Ru Than Turner remained the sole title owner.  This testimony denying ownership was a blatant misrepresentation.  Mrs. Turner's and Mrs. Schrampfer's affidavits reveal that Defendants and Mrs. Schrampfer arranged for Mrs. Turner to have title for the purpose of providing an asset available for sale either at Mrs. Schrampfer's death or a serious illness.  Yet, this arrangement was not reported by Defendants.

In response to the Trustee's Motion, Defendants contend that they never considered this property to be theirs; and that the Tyrone Property belonged to Mrs. Schrampfer, who lived there and made all of the mortgage payments.  Mrs. Turner states that at the time of the conveyance to her, she was not aware that she was put on the deed.  However, without some knowledge of an ownership interest, Defendants would not have listed the Tyrone Property as belonging to them on their Original Schedule A.  Therefore, the complete denial of any type of ownership at the Chapter 7 creditors meeting was a knowledgeable and purposeful misrepresentation.

Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are unavailable to the bankruptcy estate.  *Leffingwell*, 279 B.R. at 350. Debtors may not decide for themselves the nature of their property interest or that a property interest need not be reported. *In re Vaughan*, No. WO-04-039, 2006 W.L. 774665, at *5 (10th Cir. BAP 2006) ("The debtors may not decide for themselves the nature of their interest in property, the value of that property or the amount of their equity therein.").

In their sworn testimony at the creditors meeting, instead of explaining the arrangement with Mrs. Schrampfer for the sale of the property and distribution of the proceeds upon her death

or illness, Defendants chose to falsely represent that Mrs. Turner had no interest whatsoever in the property. Based on these facts, the Court concludes that Defendants knowingly made a fraudulent misrepresentation to their creditors and the Trustee.

### Cattle

Defendants provided false information regarding the number of cattle owned both at the time of filing and during the bankruptcy case itself. The Original Schedules filed in March 2003 stated that cattle and horses owned at the time of filing had a value of approximately $108,000.00, a number which Mr. Turner himself admitted was conservative but was never corrected by amendment. At the initial meeting of creditors held in March 2003, Mr. Turner estimated that he owned 700 head of cattle. In December of 2003, the First Amended Disclosure Statement states that Defendants owned 950 head of cattle worth over $500,000.00. In the Response to the Bank's Motion, Mr. Turner explains that he over-estimated the number of cattle in the First Amended Disclosure Statement in an attempt to have his plan of reorganization accepted by the creditors. Mr. Turner states that in the First Amended Disclosure Statement he should not have been so specific as to the number of cattle owned, because this was an estimation that was too ambitious.[25] Mr. Turner admits to an a falsely inflated number for the purpose of having the reorganization approved, which is a false oath.

In addition, Mr. Turner states that a detailed count of cattle would have cleared up the discrepancy; however, in 2004, when given a chance to explain and give an accurate accounting

---

[25] His affidavit states,

> At best, in being ambitious and wanting to reorganize my businesses to include a ranching division, I estimated more mother cows than actually would have existed had I or First Savings Bank and I had gone out in earnest at branding an counted mother cows.

Resp. To Bank's Motion Ex. E, Joe Thomas Turner Aff. ¶ 3.

35

of his holdings, Mr. Turner declined and answered simply, "I don't know." *See Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) (upholding grant of summary judgment on false oath claim and stating that a denial of knowledge may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it; and if so, there is no occasion to submit the issue of knowledge to determination at a trial.) and *Baccala Realty, Inc. v. Fink (In re Fink)*, 351 B.R. 511, 526 (Bankr. N.D. Ill. 2006) (citation omitted) ("Debtors have the ultimate responsibility for the accuracy of the information contained in their schedules, which cannot be avoided by playing ostrich.").

Mr. Turner's statements reveal his state of mind and purpose. He admitted that he over-estimated the number of cattle at the initial creditors meeting and in the First Amended Disclosure Statement. When compelled to answer interrogatories by this Court, Mr. Turner stated that he did not know at the time of filing how many cattle he had as it is impossible to do an inventory at that time of year. In testimony at the hearing on conversion, Mr. Turner stated that to avoid getting "nailed" by the Bank in a misstatement, he would not commit to a number at all. In sum, Mr. Turner admits that he over stated the number of cattle; that his sons sold cattle without his knowledge, and that in the end, he realized the true number of cattle only when the entire herd was sold at the end of 2004. Even if true, these explanations do not mitigate the fact that Defendants made intentional misstatements for the purpose of misleading creditors and the Trustee. At the least, contradictory testimony, which culminated in the denial of knowledge altogether, leads to the conclusion that Mr. Turner had a reckless disregard for the truth of his many and varied assertions.

**The Ru Than Investment Account**

Defendants maintained a joint investment account at Edward Jones part of which consisted of shares in The Investment Company of America that were placed in Ru Than Turner's name in February 1997. This account was not disclosed on the Original or Amended Schedules and Statements of Financial Affairs. Defendants also failed to disclose the liquidation of this account and the transfer of funds into the Wells Fargo checking account held in Defendants' and Mrs. Schrampfer's names. Defendants maintain in their affidavits that they always considered this money as belonging to Mrs. Schrampfer. Mrs. Schrampfer's explanation is that in similar manner as her house, she "entrusted her daughter to have the account placed in her name with the understanding that the monies were mine." Schrampfer Aff. ¶ 7. The checks signed by Mrs. Turner; however, belie the assertion that Mrs. Turner considered this money beyond her reach. But, even if Defendants considered the money as belonging to Mrs. Schrampfer, they were obligated to disclose its existence and to explain the circumstances under which this money was held. This is another example of the Defendants' pattern of concealment of assets in this bankruptcy.

It is not the responsibility of creditors and the trustee to seek out the truth or falsity of statements made under oath. *Leffingwell*, 279 B.R. at 350 (stating that the purpose of the false oath provision is to ensure that adequate information is available without the need of examinations or investigations to determine whether the information is true). It is the debtor's duty to be honest and candid with his or her creditors as part of the price a debtor agrees to pay in exchange for the free injunction and fresh start that bankruptcy delivers. *In re Matthews*, 154 B.R. 673, 679 n.8 (Bankr. W.D. Tex. 1993). Due to the many omissions of assets and inaccurate and incomplete information in the bankruptcy filings and in testimony before creditors and the

trustee, the Court concludes that Defendants have violated § 727(a)(4) and that a denial of discharge is warranted under this section.

**Section 727(a)(2) Concealment or Transfer With Intent to Hinder, Delay or Defraud.**

Section § 727(a)(2) provides for the denial of a discharge if a debtor, with intent to hinder, delay or defraud, transfers, removes or conceals property of the debtor within one year before the filing or after filing of the petition. 11 U.S.C. § 727(a)(2)(A) and (B); *Gullickson v. Brown*, 108 F.3d 1290, 1293 (10ᵗʰ Cir. 1997).  In order to obtain a denial of discharge under § 727(a)(2), a plaintiff must show by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior to the bankruptcy filing or after the bankruptcy, (4) with the intent to hinder, delay, or defraud a creditor. *Id.*  The plaintiff bears the burden of establishing each of these elements by a preponderance of the evidence.  *Annino, Draper & Moore, PC v. Lang (In re Lang)*, 246 B.R. 463, 468 (Bankr. D. Mass. 2000)(citations omitted); *Gullickson*, 108 F.3d at 1293.

As a general proposition, intent is rarely found in a summary judgment context.  *Gorsky v. D'Avignon (In re D'Avignon)*, 25 B.R. 838, 844 (Bankr. Vt. 1982).  However, summary judgment on this section is sometimes appropriate. *See e.g. Carter v. Trammell (In re Trammell)*, 197 B.R. 309, 311 (Bankr. W.D. Ark. 1996) (granting summary judgment denying discharge under § 727(a)(2)(A) on three separate grounds); *First National Bank v. Davison (In re Davison)*, 2004 W.L. 2852352 * 4 (10ᵗʰ Cir. BAP 2004) (upholding grant of summary judgment

denying discharge under § 727(a)(4));[26] *cf. Johnson & Johnson, Fin. Corp. v. Gertsch (In re Gertsch)*, 237 B.R. 160, 165 (9th Cir. BAP 1999) (upholding grant of summary judgment on intent to defraud requirement of § 523(a)(2)(B) and stating, "summary judgment is appropriate if all reasonable inferences defeat the claims of one side, even when intent is at issue."); and *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) ("Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.").

For purposes of denial of discharge under this section, intent to hinder, delay or defraud may be shown through circumstantial evidence from which the Court may infer actual intent to hinder, delay or defraud creditors. *Lang*, 246 B.R. at 468. To infer fraudulent intent, courts look for specific indicia of fraud. *Marine Midland Business Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991). The indicia or badges of fraud including the following: (1) lack or inadequacy of consideration for a transfer; (2) existence of a family, friendship, or special relationship between parties; (3) attempt by debtor to keep asset or transfer secret; (4) financial condition of the party sought to be charged both before and after transaction; (5) existence or cumulative effect of pattern or course of conduct after incurrence of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) overall chronology of events and

---

[26] The *Davison* court noted that the bankruptcy court found fraudulent intent sufficient to deny discharge under § 727(a)(4) based on the following evidence:
   (1) the Debtors never filed an amendment to correct their statement of financial affairs;
   (2) the Debtors did not voluntarily bring the omissions to anyone's attention before the Bank examined the Debtors for the second time under Rule 2004; (3) the Debtors waited until they were questioned about the omitted transfers before they admitted them; (4) the Debtors never explained why they failed to disclose the transfers in their statement of financial affairs. *Davison*, 2004 W.L. 2852352 * 3.

39

transactions. *Gullickson*, 108 F.3d at 1293.  *See also, Lang*, 246 B.R. at 469 (finding that transfer of estate assets to debtor's father within one year of bankruptcy warranted denial of discharge) and *National City Bank v. McNamara (In re McNamara)*, 89 B.R. 648, 654 (Bankr. N.D. Ohio 1988) (granting summary judgment denying discharge under § 727(a)(2) for concealment of property upon admission by debtor that he concealed cash in a closet then used cash to purchase house in another's name and stating that a presumption of fraudulent intent arises when a debtor transfers property gratuitously or to relatives).

### The Ru Than Turner Investment Account

Failure to disclose a bank account in which the debtor deposits funds constitutes concealment. *See*, *Craig*, 252 B.R. 827, 828 (Bankr. S.D. Fla. 1994) (granting denial of discharge on summary judgment for concealment of assets) (citation omitted).  The deposit of funds into a bank account also constitutes a transfer for purposes of § 727(a)(2). *Ameritrust Nat'l Bank v. Davidson (In re Davidson)*, 164 B.R. 782, 785 (Bankr.S.D.Fla.1994), *aff'd in relevant part*, 178 B.R. 544 (S.D.Fla.1995), cited in *Craig*, 252 B.R. at 827.

The funds in the Ru Than Turner Investment Account were in Mrs. Turner's name alone and were valued at more than $30,000.00 at the time of filing.  Yet this account was not reported in the Original or Amended Schedules.  This was not the only omission relating to these funds. Defendants failed to report the redemption of the shares from this account not only in the schedules and statements but also pursuant to the March 2004 Stipulation, in which Defendants agreed to disclose all assets and all transfers to insiders and all general transfers of more than $1,000.00.[27]  Moreover, the deposit of the proceeds from the redemption and the further transfer

---

[27] Ru Than Turner's mother is an insider for purposes of proceedings in bankruptcy. 11 U.S.C. § 101(31)(A)(i) (defining "insider" as ". . . a relative of the debtor.").

of the funds from a checking account by both Mrs. Turner and her mother to pay expenses of Defendants' sons' business were concealed.

Defendants argue that there is a genuine issue of fact as to who owned these funds. Defendants contend that they always thought of those funds as belonging to Mrs. Turner's mother, and never considered those funds as their own. Resp. To Tr's Motion Ex. A, Joe Thomas Turner Aff. ¶ 2(c). Even if Defendants considered Mrs. Schrampfer as the true owner of the funds, Defendant were obligated to disclose the existence of the funds because they were held in Ru Than Turner's name alone. Defendants argue that the yearly account statements show that the funds were left to collect earnings from 1997 until 2004, as further evidence that they did not consider the funds as their own. However, Mrs. Turner's actions in 2004 contradict this assertion. The shares were redeemed at the direction of Mrs. Turner and she signed two of the checks herself for the benefit of her sons. Even if the intent at the beginning was to hold the funds for Mrs. Schrampfer, the fact remains that from February 1997 to November 2004, the funds were held in Ru Than Turner's name alone and she exercised control over the redemption and over the use of some of these funds. Considering the initial non-disclosure of this account; the redemption of the shares; the deposit of the funds into the undisclosed Wells Fargo account; and the use of the funds by Ru Than Turner for the benefit Defendants' sons, the Court finds a pattern of activity that reveals intent to conceal the funds in an attempt to hinder, delay or defraud creditors.

### The Tyrone Property

As of December 28, 2001, legal title to the Tyrone Property was held by Mrs. Turner as evidenced by the Warranty Deed. Tr's Ex. 8. Mrs. Turner stated that at the time of the deed, she

did not know that title was placed in her name. However, her fee ownership was disclosed in the Original Schedules. Mrs. Turner's ownership interest was later omitted from the Defendants' Amended Schedule A and described as property held for another in the Amended Statement of Financial Affairs. Her mother stated that she entrusted Ru Than Turner with title to the Tyrone Property with the understanding that when she died, Mrs. Turner was to sell the property and distribute the proceeds equally among herself and her siblings; or alternatively, if she became ill, Mrs. Turner was to use the proceeds of sale to care for her. It is implausible for Mrs. Turner to claim that she did not know that she was on the title at the time it was granted, yet be aware of the arrangement with her mother. In testimony at the Chapter 7 creditors meeting, both Defendants denied any ownership interest in the Tyrone Property and never mentioned the arrangement with respect to the sales proceeds. Considered as a whole, this pattern of behavior of initial disclosure, then concealment after the conversion to Chapter 7, without a true explanation of the arrangement with Mrs. Schrampfer, leads to the conclusion that Defendants concealed this property with intent to at least hinder and delay, if not defraud, creditors and the Chapter 7 trustee, which is sufficient to deny discharge under § 727(a)(2)(A). *See Bank of Oklahoma v. Boudrot (In re Boudrot)*, 287 B.R. 582, 586 (Bankr. W.D. Okla. 2002) ("Because § 727(a)(2) is in the disjunctive, it is unnecessary . . . to prove fraud so long as they can establish the debtor's intent to hinder or delay."), quoting *Cuervo v. Snell (In re Snell)*, 240 B.R. 728, 730 (Bankr.S.D.Ohio 1999). "Thus, debtors can be said to act with an intent to hinder their creditors if they intend to impede or obstruct them. They can be said to act with intent to delay if they intend to slow or postpone their creditors." *Id.* (citation omitted).

### Cash From 4T, LLC and Billings and Note Receivable From 4T, LLC

42

Defendants reported in their Amended Statement of Financial Affairs that they participated in a business named "4T Company" in 2000. Mr. Turner owned an interest in 4T, LLC in 2000 but that the interest was transferred to the Defendants' sons in 2001 as evidenced by the August 2001 letter agreeing to transfer 4T, LLC to his sons. Def's Resp. To Bank's Motion Ex. F. However, after 4T, LLC sold assets held in a partnership for $100,000.00, San Man, Mr. Turner's sole proprietorship, received $76,700.00 of the proceeds of that sale. These funds were deposited into the San Man bank account on January 28, 2003, the day before the bankruptcy was filed. *See* Def's Resp. To Bank's Motion Ex. F, Mike Trujillo Dep. p. 45, lines 3 – 17. Defendants made no disclosure regarding those funds in the Original Schedules.[28] Mr. Turner does not dispute the receipt of the funds and states that this transfer was out of the generosity and devotion of his sons to keep the San Man business viable. However, this money is not reported in the bankruptcy schedules or in the MOR's. The balance of bank accounts and cash reported in the Original Schedules was less than $400.00, yet approximately 24 hours before, there had been a check given to San Man in the amount of $76,700.00. Defendants never amended their schedules to reflect receipt of these funds, nor did the Defendants disclose the disposition of these funds. In like manner, the gift or loan of $50,000.00 from Mr. Billings, Sr. after bankruptcy was filed was not disclosed, as discussed above.

In addition, Defendants failed to report a debt for more than $150,000.00 owed to them by 4T, LLC as an asset of the bankruptcy estate even though internal financial reports carried the debt as a note receivable. According to the accountant, the note was omitted as an asset by a

---

[28] The Court notes that an account summary for the business account held by San Man at Am Bank account in San Man attached to the Original Schedules only shows account activity up to December 31, 2002. Exhibit to Statement of affairs No. 3. Tr's Ex. 2 pp. 69-81. Therefore, a deposit into the San Man account of the $76,700.00 check would not appear on this statement.

43

journal entry in order to clean up the books.  Mr. Turner contends that he never "hid that transaction" because he disclosed the note receivable on "the initial report to the U.S. Trustee, sent after February 13, 2003, . . . [on] a balance sheet for San Man for the year 2002."  Resp. To Bank's Motion Ex. E, Joe Thomas Turner Aff. ¶ 10.  No such report or balance sheet has been presented to the Court to verify this statement, and the Court can find no such statement on the record.

The undisputed facts clearly demonstrate the presence of the all of the elements of § 727(a)(2)(A) and (B).  Defendants concealed or transferred property belonging to them and to their business prior to and after the bankruptcy was filed with the intent to hinder, delay or defraud creditors.  Defendants failed to disclose the funds held in the Ru Than Turner Investment Account worth more than $30,000.00 at the time of filing.  Mrs. Turner liquidated the asset post-petition, deposited the proceeds into an undisclosed joint checking account and transferred some of the proceeds for the benefit of Defendants' sons. From this series of actions, the Court concludes that Defendants used a concealed account to funnel bankruptcy assets out of the estate and into the hands of family members after the bankruptcy was filed and after the March 2004 Stipulation, which required the Defendants to report all transfers to insiders and all transfers of more than $1,000.00.  However, this is not the asset concealed or transferred by Defendants in such a way as to hinder, delay or defraud creditors.

Mrs. Turner's ownership of the Tyrone Property was disclosed in the Original Schedules but omitted from the Amended Schedules.  The omission from the Amended Schedules coupled with the testimony of Defendants at the Chapter 7 creditors meeting that Mrs. Turner did not own "even a piece" of the Tyrone Property raises an inference that Defendants intended to

44

conceal this recorded fee ownership from creditors in the Defendants' converted Chapter 7

bankruptcy case.  Instead of disclosing Mrs. Turner's ownership for the benefit of her mother

with instructions regarding the sales proceeds, Defendants denied any ownership interest, and

testified that Mrs. Turner held only a power of attorney with respect to this property.  This false

characterization of their interest in the Tyrone Property illustrates that Defendants concealed the

ownership interest with the actual intent to hinder, delay or defraud creditors and the Chapter 7

Trustee.

Defendants concealed the receipt of $76,700.00 from their sons the day before

bankruptcy and $50,000.00 received from Mr. Billings one month after bankruptcy.  Defendants

also concealed the note receivable from 4T, LLC, even though the note was reported in San Man

internal financial reports as an asset.  Because Defendants disregarded the stringent reporting

requirements of both the Bankruptcy Code and the March 2004 Stipulation on so many

occasions, the Court finds that Defendants concealed and transferred assets with intent to hinder,

delay or defraud and will grant summary judgment denying discharge under § 727(a)(2).

*Farmers Co-op Ass'n of Talmage, Kan. v. Strunk,* 671 F.2d 391, 395 (10th Cir. 1982)

("Fraudulent intent . . . may be established . . . by inferences drawn from a course of conduct.").

For the reasons stated above, the Defendants are denied a discharge under §§ 727(a)(2),

(a)(4) and (a)(5).  An appropriate judgment will be entered.

_____
MARK B. McFEELEY
UNITED STATES BANKRUPTCY JUDGE

Copies to:

45

Ron Andazola
Assistant United States Trustee
PO Box 608
Albuquerque, NM 87103-0608

James A. Roggow
Attorney for First Savings Bank
P.O. Drawer 1837
Las Cruces, NM 88004-1837

Jim Foy
Attorney for Defendants
PO Box 2615
Silver City, NM 88062-2615